DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARY S. LINTON, Ph.D., | ) | |
| | ) | CASE NO.  5:02 CV 820 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STREETSBORO CITY SCHOOL | ) | |
| DISTRICT BOARD OF EDUCATION, | ) | |
| *et al.,* | ) | |
| | ) | |
| Defendants. | | |

## I.  Introduction.

The defendants, Streetsboro City School District Board of Education, Todd Puster, Deborah M. Wolff and Cynthia Pennock-Hannish, filed with the court on April 25, 2006 a motion for relief from judgment pursuant to the provisions of Fed. R. Civ. P. 60(b) (Docket #151).  Thereafter, on May 9, 2006, the defendants supplemented their motion (Docket #154) . The plaintiff filed opposition to the motion on May 10, 2006 (Docket # 155).  On May 17, 2006 the defendants filed a reply to the plaintiff's response (Docket #156).  The motion for relief from judgment is at issue.

## II.  History of the Litigation.

The plaintiff filed her complaint on May 1, 2002 with a number of causes of action. Central to her complaint was the fact of her prior employment by the defendant Board of Education as its superintendent.  The employment ended with an agreement which included a confidentiality clause that stated:

(5:02 CV 820)

> The Board agrees to maintain this Agreement and Release and issues relating to her employment with the Board as confidential and the Board, to the maximum extent permitted by law, shall keep this Agreement and Release and issues relating to Linton's employment confidential.  The terms of this Agreement and Release are intended to be enforced as herein written to the maximum extent permitted by law.

The parties engaged in a lengthy period of discovery and motion practice which eventually resulted in the court granting the defendants summary judgment on all claims except the plaintiff's breach of contract action.  Trial commenced on July 19, 2004.  After a 3-day trial, the jury returned a verdict on the contract claim against the defendants in the amount of $891,919.00.  The defendants moved for a new trial and a remittitur.  While the court had the motion for new trial under consideration, it referred the parties to Magistrate Judge James Gallas to conduct post-verdict mediation.  The mediation failed.  On October 6, 2004, the court denied the defendants' motion for new trial but granted a remittitur reducing the total award to $725,523.00  The plaintiff accepted the remittitur.

Both parties appealed.  The defendant appealed the award of the judgment and the plaintiff appealed the granting of summary judgment on her remaining claims.

On January 13, 2006 the Sixth Circuit Court of Appeals affirmed the jury verdict and affirmed the court's granting of summary judgment to the defendants on the plaintiff's remaining claims.

The Sixth Circuit's Memorandum Opinion succinctly described the factual background supporting the plaintiff's breach of contract claim in the following description:

> Shortly after her departure from Streetsboro, Linton accepted a job as a superintendent in Virginia.  A few months later, the Ohio State Auditor's office released a report concerning its investigation into alleged improprieties in the

2

(5:02 CV 820)

Streetsboro school system finding no illegalities, but detailing various questionable practices in the school system.  Immediately after the issuance of this report, the Board, although not required to by law, issued a press release concerning the audit report.  This press release was extremely critical of Linton, focused solely upon that portion of the Auditor's report concerning her, and included quotes from various Board members and the Treasurer that were especially unfavorable to Linton.

This press release was eventually reported in newspapers in Virginia.  As a result of the ensuing controversy, Linton resigned her superintendent position in Virginia and began looking for other positions.  During this search and after the institution of these proceedings, Linton learned that she had been selected as one of "five or six" candidates to interview for the superintendent's position with the Stafford County School District in Virginia.  However, after being selected as a finalist, a routine background check conducted by the Virginia School Board Association ("VSBA") revealed the accusations of financial irregularities from Streetsboro.  Based upon this information, Stafford County declined to interview Linton.

Linton's lawsuit asserted claims for breach of contract due to Defendants' breach of the confidentiality provision in the severance agreement, defamation, intentional infliction of emotional distress, and civil conspiracy.  After a jury trial, the court granted Linton damages in an amount that was eventually reduced to $725,523.

### III.  The Predicate for the Defendants' Rule 60(b) Motion for Relief from Judgment.

The defendants' motion is anchored in the factual proposition that subsequent to the jury verdict the plaintiff became employed as the superintendent for the Neshannock Township School District.  Continuing, the defendants assert "since Plaintiff's claim for damages at trial was based upon the assertion that the Defendants made her unemployable as a school superintendent, this new development requires a re-evaluation of the amount of the jury award."

The defendants' brief continues with the following statements:

The Defendants expressly reserve all existing rights to appeal other issues regarding the jury verdict and the Sixth Circuit Court of Appeals' affirmance of same.  This motion only seeks relief from the amount of the future damages

3

(5:02 CV 820)

portion of the jury verdict, and not from issues of past damages, liability and/or causation.

> Fed. R. Civ. P. 60(b) provides in pertinent part as follows:
> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:
> ***(6) any other reason justifying relief from the operation of the judgment.  The motion shall be made within a reasonable time ***.

Recent and extraordinary events in this case now justify an award of relief to the Defendants from the operation of the judgment.  Plaintiff, Linton, testified at trial that her whole reason for filing her lawsuit was her belief that she could not get a job as a superintendent because the Defendants breached a contract of confidentiality with her.  ( R. 113, Mary Linton, TR 7/20/04, p. 3).  Earlier this year, Linton's brief was proven wrong.  On February 20, 2006, Linton, now known as Mary Todaro, signed a contract for employment as the superintendent of the Neshannock Township School District.  (Ex. A, attached).  Thus, contrary to her testimony, Linton could and did get a job as a superintendent for a school district.

At the conclusion of the trial in this case, Linton was awarded future damages, representing the difference in earnings she expected she would have received as a superintendent versus as an assistant superintendent for the next twelve years (when she planned to retire).  Current events have revealed that Linton did not, in fact, incur twelve years of damages. At most, Linton incurred only twenty months of damages from the date of the verdict, July 21, 2004, until March, 2006, when the term of her Neshannock contract commenced.

### IV.  Testimony and Argument during the Trial Concerning the Plaintiff's Employability as a School Superintendent.

The plaintiff's testimony regarding future employability as a school superintendent was

the starting point of plaintiff's testimony as indicated in the following colloquy:

BY MR. SKAKUN:

Q.      Good morning.

A.      Good morning.

4

(5:02 CV 820)

Q.      Would you please state your full name for the record?

A.      Dr. Mary Sandra Linton.

Q.      Dr. Linton, would you please tell this jury why you brought this lawsuit?

A.      On October 28th, the year 2000, at 10:00 o'clock at night Mr. Chuck Defer and Bill Koleszar came to my home, asked me for my keys, and told me I was assigned to home.
        I had thought up until that point I had no clue.  I thought my life was perfect.  I loved my job.  I planned all my life when I started in education to be a superintendent, and that night changed my life drastically.
        I cannot get a job as a superintendent because the School Board and Todd Puster, especially, have violated a contract that I held very seriously, and have prevented me from getting jobs, have prevented me from getting jobs as superintendent, and have destroyed my reputation.
        And any of you that know when your reputation is destroyed, you can never repair that reputation.

Q.      Is this – have you ever filed any other lawsuit before this one?

A.      No, I have not.

Q.      What is your current position of employment?

A.      I'm an Assistant Superintendent in North Allegheny Schools in Pittsburgh, Pennsylvania.  I'm in charge of Secondary Education and Curriculum.

Q.      And how long have you held that position?

A.      Since July 1st of the year 2003.

(Transcript, pg. 2 line 11 through pg. 3 line 18.) [1]

---

[1] The transcript of the proceedings of the trial, Vol. I, Vol. II and Vol. III, are noted on the docket as numbers 125, 126 and 127.  However, an examination of the three volumes omits the transcript of the trial testimony of the plaintiff, Mary Linton.  That transcript of 104 pages is under Docket #113.  Consequently, a complete review of the testimony at the trial requires examination of Dockets 125, 126, 127 and 113.

(5:02 CV 820)

During the plaintiff's cross-examination, it was revealed by defendants' counsel, that the plaintiff still wanted to be a superintendent and was presently looking for employment in the following colloquy:

> Q.    Now, you've talked about your reputation being damaged.  To a great extent your reputation was damaged before you entered into the June 6, 2001 agreement and release, correct?
>
> A.    Oh, yes.
>
> Q.    And I think it would be correct also that prior to June 6th, 2001 you had applied to multiple places in Ohio and about, for employment, and the only place you got feelers from would have been the King and Queen job, correct?
>
> A.    No, that's not correct.
>
> Q.    Okay, when (sic) other places did you get offers from?
>
> A.    I do not know.  It wasn't an offer.
>          I do not know the name of a school district but it was in the Bellefontaine area.  When I went in for my second interview.
>
> Q.    Did you get an offer there?
>
> A.    They told me as I walked out – not.
>
> Q.    I just wondered if you got an offer?
>
> A.    No, I got a second interview.
>
> Q.    And that would have been, you applied for that job prior to June 6th, 2001?
>
> A.    Correct.
>
> Q.    And you feel you did not get offered that job given what had gone on between you and the Board in Streetsboro before June 6th, 2001?
>
> A.    That's exactly what the President of the School Board of that school told me.

(5:02 CV 820)

Q.      Well, I'm just asking.

A.      Yes.

Q.      But fortunately, you have found employment continuously up until today's date where you are working as an Assistant Superintendent at a large school district in Pittsburgh?

        THE COURT: Well, I'm not going to allow her to answer that question, unless you remove the word "fortunately."

        MR. PFAU: I will remove the word.

Q.      You presently are employed in the Pittsburgh area as Assistant Superintendent earning, next year, 106,000 or thereabouts, correct?

A.      Correct.

Q.      <u>Are you presently looking for any other employment?</u>

A.      <u>I've always wanted to be a superintendent.  Yes, I am.</u>

Q.      Where are you presently looking for employment?

A.      I applied at Center – in Beaver County, Center County Schools and did not make it to the top five cut.  And I never called to find out why.

(Transcript, pg. 96, ln. 2 through pg. 97, ln. 25.[2]  Emphasis added.)

During final argument defendant's counsel suggested that the plaintiff could be employed as a superintendent in the future during the following phase of his argument:

        Mary Linton, fortunately, is a very bright and very charming individual, as you saw from the stand.  She fortunately has talents and abilities and has worked continuously.  She worked continuously up to the point she was at Streetsboro.  She was a Superintendent there.  She earned $85,000 a year there.
        After leaving Streetsboro she received an $85,000 settlement.  She didn't just leave without any reservation or anything for the good of the kids, as she suggests, she got $85,000 to buy out her contract.

_____

[2] This testimony also appears in the transcript noted at Docket #113.

(5:02 CV 820)

She took that $85,000, went to Virginia, where she started a job continuously.  She started in July of 2001, the same year as she entered into the settlement agreement.  At King and Queen County she received $88,500 a year, she had actually an increase in salary.  She works there, she works there, I think, until June of 2003.  She resigns there.  Immediately gets another job.

Now there has been testimony about the difference between being a Superintendent and an Assistant Superintendent, and let's look at that for a minute.  As Superintendent at Streetsboro you got about 2,000 students, I think the testimony was, something like that, that the Superintendent would be in charge of.

At King and Queen it was a much smaller, it was about 900.  Mary Linton goes in June of '03, or thereabouts, to North Allegheny Schools, a much larger district, has several thousand, I think 8,000 students.  So it's a much bigger district.  And they therefore compensate their Assistant Superintendents much more.  She's making much more than she did as a Superintendent at Streetsboro or King and Queen.

So, even though plaintiff's [sic] contend this is a move downwards, monetarily it's a move upwards.  It's also an area where as an Assistant Superintendent, now you've got 8,000 students you are dealing with, not just 2 or 900 as she dealt with before.  So I would suggest to you that the North Allegheny job is not a move downwards, but a move upwards.  She's making more money.  She indicated this year she'll get $106,000 and her future looks bright.  There is no reason why she can't be employed as a Superintendent in the future.

You heard Cindy Hanish who said, based on her experience on two separate boards she was on, she saw no reason why Mary Linton couldn't get a Superintendent job in the future.

(Transcript, pg. 372 ln. 17 through pg. 374 ln. 16.[3] Emphasis added.)

It is apparent, from an historical standpoint, that the defendants contended, as to the issue of damages, that the plaintiff remain potentially employable as a school superintendent.

Moreover, the plaintiff conceded that she was still applying for school superintendent positions.

It was against this background that the jury considered and returned the damage award.   The court then granted the remittitur because of the absence of any testimony either from the plaintiff or from the defendants as to the present value of the plaintiff's damages.

---

[3] This is found in Vol. III of the trial transcript.  See Docket #127.

(5:02 CV 820)

It is apparent that the defendants are of the view that they are entitled to reopen the issue of damages including the recent event of the plaintiff obtaining a job as a school superintendent.

### V.  The Defendant's Rule 60(b) Motion Fails Under the Authority of
### *Davis v. Jellico Community Hospital*, 912 F.2d 129 (6th Cir. 1990)

In the *Davis* case, the plaintiff, a 24 year old Kentucky resident, received a serious head injury in a one car automobile accident on November 13, 1986.  Between November 13, 1986 and November 26, 1986, Davis complained of headaches and was treated by the defendant doctors in the emergency room of the Jellico Community Hospital.  On November 26, 1986, Davis suffered a seizure and remained in a coma in a persistent vegetative state as a result of permanent brain damage.  A malpractice case was brought on his behalf against the doctors and the hospital. Two years later, on December 19, 1998, the plaintiff received a jury verdict in the amount of $2.5 million.  Thirty-one days later, on January 21, 1989, Davis died of cardiac arrest prompting a defense post-trial motion and request for new trial on the issue of Davis' damages by reason of his death.

Judge Boyce Martin, writing for the circuit, engaged in exhaustive review of the use of Rule 60(b) motions in a post-verdict setting where there was a change with respect to the extent of the damages.  The decision in *Davis* denied the Rule 60(b) motion.

9

(5:02 CV 820)

The ruling in *Davis* remains the law of the Sixth Circuit.  This court is obliged to follow the reasoning in *Davis*.  It is applicable to the defendants' Rule 60(b) motion.   The Rule 60(b) motion for a new trial on the issue of damages (Docket #151) is DENIED.

IT IS SO ORDERED.


  May 26, 2006                                           *s/ David D. Dowd, Jr.*
Date                                                         David D. Dowd, Jr.
                                                             U.S. District Judge